# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 26, 2010 Session

## STATE OF TENNESSEE v. NILE BRADLEY LARUE

### Direct Appeal from the Criminal Court for Knox County
#### No. 88650      Richard R. Baumgartner, Judge

### No. E2009-01670-CCA-R3-CD - Filed June 9, 2011

A Knox County Criminal Court jury convicted the appellant, Nile Bradley LaRue, of voluntary manslaughter. After a sentencing hearing, the trial court sentenced him to six years to be served as one year in jail and the remainder on probation. On appeal, the appellant contends that (1) the evidence is insufficient to support the conviction, (2) the trial court committed plain error by instructing the jury on the defense of protection of property, and (3) his six-year sentence is excessive and the trial court erred by denying his request for full probation. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Bruce E. Poston (on appeal) and Gregory Paul Isaacs (at trial), Knoxville, Tennessee, for the appellant, Nile Bradley LaRue.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

A Knox County grand jury indicted the appellant for the second degree murder of John Harrold. At trial, twenty-three-year-old Brandon Aaron Lee testified that during the second week of June 2007, he moved into the appellant's two-bedroom condominium in the

Fountain City area. Lee had known the appellant for about eight years, Albert Dotson for six or seven years, and the victim for a couple of months. Lee said that he had met the victim through the appellant and that he and the appellant had "hung out" with the victim previously. Lee said that on the night of June 17, 2007, he and the appellant ate at a Chili's restaurant and "drank a few margaritas." Then they went to Walmart to buy beer because some people were coming over to the condo.

Lee testified that he and the appellant bought the beer and returned to the condo. Lee said that two girls and Dotson were also there and that "[w]e just all started drinking." At some point, the appellant began showing Lee some text messages that the appellant was receiving on his cellular telephone from the victim. Lee testified that the appellant "started replying back" to the victim and that the appellant "was kind of freaking out a little bit." The appellant told Lee that the victim was going to come to the condo, but Lee told the appellant not to worry about it. After the two girls left the condo, Lee went to bed.

Lee testified that he went to sleep and that Dotson woke him up, telling him that the victim was there. Lee got out of bed and went outside to see what was going on. He saw the appellant and the victim standing on the street and talking. They were not yelling, and Lee was not worried. He said that he asked the victim why the victim was there and that the victim said, "Nile knows why I'm here[.]" Lee said the appellant stated, "No. I don't know why you're here[.]" Lee said that the victim began putting on leather gloves and that the victim told the appellant, "Well, I have a check wrote out to me out in my car to come over here and kill you." Lee said the appellant answered, "No, you don't John, 'cause if you do have some money, it'd be a cash deal not a check." Lee began telling the victim, "Just don't worry about it. Just leave." While Lee was talking to the victim, the appellant went back inside the condo.

Lee testified that he could tell the victim had been drinking alcohol. The appellant came back outside and was holding a twelve-gauge shotgun. The appellant stood outside the front door of the condo and told the victim to leave. Lee said the victim ran up to the appellant and said, "Nile, if your -- why don't you just pull the trigger and shoot me right here." Lee said that the appellant continued to stand in front of the condo and that the victim grabbed the appellant by the shirt collar. Lee testified, "I guess [the victim was trying] to take the gun from him." Lee said that the victim pulled the appellant out to the street and that the two men "were wrestling around." The appellant fired a gunshot to warn the victim. Lee said that the appellant fired the shot in Lee's direction, that some shotgun pellets hit Lee, and that "the vehicles got sprayed pretty bad." Lee said that he "froze" and that the victim hit the appellant in the nose. The appellant stepped back and shot the victim. The victim called the appellant's name and fell to the ground. Lee and the appellant ran to the victim, and Lee ran inside the condo to telephone 911. The appellant also used his cellular telephone to call 911.

Lee said the entire incident occurred in five to ten minutes.

The State played Lee's and the appellant's 911 telephone calls for the jury. During the appellant's call, he told the 911 dispatcher that he shot the victim. When the dispatcher asked him why, he said, "Because he hit me in the nose. He was on my property."

On cross-examination, Lee acknowledged that his memory of the incident was "a little hazy about certain things." He said that the appellant and the victim had been coworkers and that the three of them "went out a couple of times." Lee said that when the appellant came out of the condo holding the shotgun, the appellant was standing four or five feet from the front door. He acknowledged that the appellant did not point the gun at the victim. The victim approached the appellant and grabbed the appellant by the collar. Lee acknowledged that after the appellant fired the warning shot, the victim did not step back. In fact, the victim punched the appellant in the nose, causing it to bleed. Lee said that he thought the victim was trying to get the gun away from the appellant but that he did not think the victim was trying to take the gun in order to kill the appellant with it.

Officer Dan Paidousis of the Knoxville Police Department testified that he was dispatched to the scene of the shooting. When he arrived, he saw a white male lying on the street. Another person was standing twenty-five to thirty feet away from the victim and was talking on a cellular telephone. That person, who was the appellant, matched the description of the shooter. Officer Paidousis got out of his patrol car and ordered the appellant to drop the telephone. On the officer's third request, the appellant put down the phone and got onto the ground. Another officer handcuffed the appellant. Blood was on the appellant, and the officers secured his condominium. They found Albert Dotson sleeping in a back bedroom.

Twenty-three-year-old Albert Dotson testified that he met the appellant when he was sixteen years old and that he met Brandon Lee a few months before he met the appellant. Dotson did not know the victim. Dotson said that on the night of June 17, 2007, he "met up with" the appellant and Lee at Walmart. Then they went to the appellant's condo and drank beer. Two girls were also there, and the appellant was texting someone. At some point, the girls left, and Dotson went to sleep in a bedroom. The appellant came into the room and was still texting. Dotson asked, "Who are you texting?" but the appellant did not answer him. Later, the appellant came back into the bedroom. When he left, Dotson got up and looked out the window. He said he went and told Lee, "That guy is here" and "[G]o take care of it." Dotson went back to bed and went to sleep. He remembered the appellant coming into the bedroom to get a gun out of the closet. He said that he asked the appellant, "What are you doing?" and that the appellant told him, "Nothing, dude. Just stay in the room."

Dotson testified that the appellant went outside and that Dotson got up and looked

-3-

outside. He said that he saw the appellant and the victim "just talking or whatever" and that he went back to bed. He said the appellant may have come into the bedroom again to get ammunition. Shortly thereafter, Dotson heard a couple of gunshots. He said he got up and hid in the shower because he was scared and "didn't know if like Nile had gone crazy or something." The appellant and Lee came inside, saying they needed to call for an ambulance. Dotson went outside and saw the victim, who appeared to be breathing, lying on the street. Dotson went back inside and went to sleep. After the police arrived, they came into the room and woke him.

Officer A.J. Loeffler of the Knoxville Police Department testified that he received a telephone call about the shooting and went to the scene. The victim was lying on the street, and the appellant, Dotson, and Lee were sitting in police cars. Dried blood was on the appellant's face, and the appellant complained that his face and chest hurt. He did not want medical attention. Officer Loeffler asked the appellant for permission to search the condo, but the appellant refused. Officer Loeffler talked with Dotson and Lee and obtained a search warrant. The police found a shotgun in the front hallway closet, and one live round was in the chamber. They found ammunition in the appellant's bedroom. An empty shotgun shell was five to six feet away from the victim's body, and the police did not find any other shells. A cellular telephone was in the victim's shorts pocket, and another officer showed Officer Loeffler how to retrieve text messages from the phone. Some of the messages referred to Ashton Menser, who had a child with the appellant, and Jennifer Buchanan, who had a child with the victim. Officer Loeffler later searched the victim's car at the city impound lot and found the victim's wallet, a set of keys, and a pocketknife. Based upon what Lee had told Officer Loeffler, Officer Loeffler was looking for a bank check in the car. However, he did not find one.

On cross-examination, Officer Loeffler testified that the blade on the pocketknife was three and one-half to four inches long. He acknowledged that Lee told him the victim and the appellant were two to three feet apart when the appellant shot the victim.

On redirect examination, Officer Loeffler testified that nothing indicated the victim had been armed. He acknowledged that Lee told him that Lee never saw the victim grab for the appellant's gun.

During his direct and cross-examination testimony, Officer Loeffler read text messages that the victim had sent to and received from the appellant and Jennifer Buchanan before the shooting. Those messages can be summarized, in relevant part, as follows:

| Time | From | To | Message |
|---|---|---|---|
| ? | victim | appellant | Damn ashton looks good tonight |
| 12:49 a.m. | appellant | victim | Yea prob so but jenn . . . has been lookin better |
| 12:50 a.m. | victim | appellant | Don't make me come off of highland to ur house |
| 12:54 a.m. | appellant | victim | Come on |
| ? | victim | Jennifer | So I hear u been hanging around nile. Nice Jennifer! |
| 12:58 a.m. | victim | Jennifer | Swear it on bary.  Cuz im on my [way] to kill him cuz he says otherwise |
| 1:12 a.m. | appellant | victim | Okay that's [what] I thought |
| ? | victim | appellant | Better lock the door cuz u will regret that comment |
| 1:14 a.m. | appellant | victim | Okay be waitin [for] ya |

Dan Crenshaw, a senior evidence technician with the Knoxville Police Department, testified that he arrived at the scene at 2:30 a.m. on June 18.  He photographed the area and took measurements.  He also collected from the appellant a ring, a bracelet, and a necklace with a pendant.

Steve Scott, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified that he received a Mossberg twelve-gauge shotgun, a fired shotgun shell, some shotgun pellets, and the victim's shirt for testing.  The shotgun was working properly, and seven and one-half pounds of pressure were needed to pull the trigger.  The spent shell was a twelve-gauge shell that had been filled with buckshot, and the shotgun had fired the shell.  Scott found a hole on the front left side of the victim's shirt.  Based on residues and chemical tests on the shirt, he concluded that the muzzle of the gun had been three to ten feet away from the victim when the appellant shot the victim.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, testified that she performed the victim's autopsy.  The victim was thirty-one years old; weighed two hundred forty-two pounds; and was five feet, eleven inches tall.  His cause of death was a shotgun wound to the abdomen.  Shotgun pellets damaged multiple organs, tore

multiple vessels, and caused tremendous bleeding. Around the wound, Dr. Mileusnic-Polchan found relatively dense stipple caused by the filler material inside the shotgun shell. Based on the stipple and the characteristics of the wound, she estimated that the muzzle of the shotgun had been two to three feet away from the victim when the appellant shot the victim. She also found a large scrape on the bridge of the victim's nose and abrasions on the left and right sides of his nose. She said that some of the injuries to the victim's face occurred when he fell onto the pavement and that some of the injuries occurred when emergency medical technicians turned him over. A bruise under the victim's scalp was consistent with his having fallen backward, and a bruise on the victim's front left shoulder indicated that the stock of the gun may have come into contact with his shoulder. She acknowledged that two red spots on the victim's face could have been caused by being hit in the face by someone wearing a ring. An injury to the victim's right leg was consistent with filler material coming into contact with the leg when the appellant fired the warning shot. The victim's blood alcohol test showed his blood contained .13 gram percent of alcohol, meaning the victim was intoxicated.

On cross-examination, Dr. Mileusnic-Polchan testified that the victim was wearing black leather gloves. She acknowledged that the bruise on the victim's shoulder could have occurred if the appellant used the stock of the gun to push the victim away. She stated that blood also was on the appellant's shirt and that, if the blood was the appellant's blood, it could have come from a bloody nose.

Twenty-one-year-old Kayla McCall testified for the appellant that she was nineteen years old at the time of the shooting and met the victim when he worked at Ole Ben Franklin Motors. On the night of June 17, McCall picked up the victim at his apartment and drove to Ashton Menser's house. The victim had been drinking beer at his apartment, and he drank a couple of additional beers at Menser's home. About 10:30 p.m., McCall and the victim drove to the Electric Cowboy, a nightclub on Kingston Pike. McCall recently had been banned from the club, but the victim knew the club owner and thought he could get McCall into the club anyway. They arrived at the club about 11:00 p.m., and McCall waited in the car while the victim went inside. The victim was in the club for a while, and McCall continued to wait for him outside. At 1:17 a.m., the victim texted her from inside the club, stating, "I'm going to kill Nile." McCall texted the victim, "Why?" and "John, you don't need to kill anyone because then I wouldn't get to kiss you ever again." She said she thought the victim was serious about killing the appellant and that she texted him, "If you touch Nile, you won't have a job anymore. Don't do this." The victim texted to McCall, "Door now." McCall said that she drove to the front of the club, that the victim got into the car, and that the victim told her, "You have a choice. You can either take me home, or you can take me to Nile's." She said the victim had been drinking and was "in a deep stare."

McCall testified that she drove the victim to his apartment and took his dog outside for a walk. When she went back to the apartment and opened the door, a baseball bat fell onto the floor. McCall hid the bat. The victim got some gloves and put them on. He also put on some shoes and told her, "I'm leaving." She said that she was "pretty sure" the victim was going to the appellant's condo and that the victim would "[p]robably try to kill [the appellant]."

On cross-examination, McCall testified that she had known the victim for one or two months before shooting. She said that after she and the victim left the club and returned to his apartment, the victim was "in a blank state of mind." She acknowledged that she did not call 911. She explained, "I've never really been in that sort of situation before. I called Ashton a million times, and her phone had died. So I didn't really know anyone else's phone number to call." Although the appellant had been charged with second degree murder, a Class A felony, the jury convicted him of voluntary manslaughter, a Class C felony.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction because the evidence shows he acted in self-defense. The State argues that the jury reasonably rejected the appellant's self-defense theory. We agree with the State.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Our Code provides that the use of force may be justified when a person (1) "has a reasonable belief that there is an imminent

danger of death or serious bodily injury"; (2) "[t]he danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time"; and (3) "[t]he belief of danger is founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(b)(2). Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

The defendant does not contest that he shot the victim in a state of passion. Instead, he argues that the jury erroneously rejected his claim of self-defense because the evidence showed that the victim threatened to kill him, dragged him away from his front door, and punched him in the nose. Granted, the evidence established that the victim instigated the evening's events by sending the appellant a somewhat suggestive text message about the mother of the appellant's child. The appellant sent a similar message about the mother of the victim's child, and the angry victim informed the appellant that he was coming to the appellant's condominium. When the victim arrived, the appellant voluntarily went outside to talk with him. The appellant then went back inside his home. However, instead of locking the door and calling the police, he retrieved a shotgun and returned outside. The unarmed victim approached the appellant, grabbed him by the collar, and dragged him to the street. The appellant fired a warning shot, and the victim punched the appellant in the nose. The appellant then stepped back and shot the victim. During his call to 911, the appellant told the dispatcher that he shot the victim because the victim punched him in the nose and was on his property, not because he thought the victim was going to kill him.

The fact that the jury rejected the State's argument regarding second degree murder and decided to convict the appellant of voluntary manslaughter demonstrates that it carefully considered the evidence. Given that the appellant chose to retrieve the shotgun and return outside, where the unarmed victim was waiting, we agree that the jury could have determined that the appellant's belief of imminent danger of death or serious bodily injury was unreasonable. This court does not second-guess factual determinations made by the jury, and it was within the jury's province to reject the appellant's theory of self-defense. Therefore, the evidence is sufficient to support the appellant's conviction for voluntary manslaughter.

B. Defense of Protection of Property Instruction

Next, the appellant contends that he is entitled to plain error relief because the trial court gave the jury an instruction on the defense of protection of property. The State argues that the appellant is not entitled to relief. We agree with the State.

During Brandon Lee's testimony, his and the appellant's 911 calls were played for the jury.  Based upon the appellant's telling the dispatcher that he shot the victim because the victim was on his property, the State requested that the trial court instruct the jury on a portion of Tennessee Pattern Instruction 40.08, the defense of protection of property instruction, which states, in pertinent part, as follows:

> A person in lawful possession of real or personal property is justified in threatening or using force against another when and to the degree it is reasonably believed the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property.
>
> A person who has been unlawfully dispossessed of real or personal property is justified in threatening or using force against the other when and to the degree it is reasonably believed the force is immediately necessary to re-enter the land or recover the property if the person threatens or uses the force immediately or in fresh pursuit after the dispossession;
>
> and
>
> (1) the person reasonably believes the other had no claim of right when the other dispossessed the person;
>
> and
>
> (2) the other accomplished the dispossession by threatening or using force against the person.
>
> A person is not justified in using deadly force to prevent or terminate the other's trespass on real estate or unlawful interference with personal property.

Tennessee Pattern Jury Instruction 40.08--Criminal (11th ed. 2007).  Specifically, the State requested that the trial court instruct the jury on the last portion of the instruction, that a person's use of deadly force to prevent a trespass on real estate is not justified.  The defense objected, arguing that the instruction "completely vitiates the self-defense charge." However, the trial court agreed with the State.  At first, the trial court planned to instruct the jury only

on the last part of the instruction as the State had requested. However, the defense said that reading only a portion of the instruction "takes it out of context" and requested that "if you're going to charge it, you charge the entire pattern jury instruction." Although the trial court did not consider much of the instruction to be relevant under the facts of this case, at the appellant's request, it charged the jury on the entire instruction.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

The appellant concedes that he did not file a motion for new trial. As this court has repeatedly stated, the failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review. See Tenn. R. App. P. 3(e).

Nevertheless, Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Like Tennessee Pattern Instruction 40.08, Tennessee Code Annotated section 39-11-614(c) provides that "a person is not justified in using deadly force to prevent or terminate the other's trespass on real estate or unlawful interference with personal property." In this case, the evidence shows that during the victim's altercation with the appellant, the victim walked to within a few feet of the appellant's front door, where the appellant was standing, and dragged the appellant down his driveway and into the street. The appellant told the 911 dispatcher that he shot the victim, in part, because the victim was on his property. Therefore, we agree with the trial court that the evidence justified an instruction that a defendant's protection of property is not a defense to the defendant's use of deadly force. Moreover, the instruction was a correct statement of the applicable law. Therefore, the trial court did not breach an unequivocal rule of law by giving the portion of the instruction that the State requested. While much of the pattern instruction was not relevant under the facts of this case, the appellant requested the entire instruction for tactical reasons, and he is not entitled to plain error relief.

## C. Excessive Sentence

Next, the appellant argues that his six-year sentence is excessive and that the trial court erred by denying his request for full probation. The State claims that the trial court properly sentenced the appellant. We agree with the State.

At the sentencing hearing, Linda Bragg, the victim's mother, testified that the victim was "a good man" and had "lots of friends." She said his family and his young son loved him. At the time of his death, the victim was living with his mother and was helping take care of her because she was sick. She said she was still sick and missed having him with her. She said she never thought she would be the victim of a violent crime, and she asked that the appellant receive the maximum sentence because he "took my son's life."

John J. Harrold, the victim's father, testified that the victim was his and Bragg's only child. Harrold and Bragg divorced, and the victim had some problems and got into trouble. Eventually, Harrold and the victim became estranged. Nevertheless, Harrold said that he became depressed after the victim's death by "[k]nowing that my son will never be there." He stated that the victim's "murder" had had a profound effect on his life, that he had trouble sleeping, and that he took medication for blood pressure and anxiety. He said the appellant showed no remorse or sadness at trial.

Jennifer Buchanan testified that she and the victim had a son, Braden, who was five and one-half years old when the victim was killed. She said Braden often asked where the victim was and when the victim was coming back. She said that the victim and Braden were close and that Braden was still grieving. She said that her family would never be the same

and that "our hearts are broken and our lives are shattered." She asked that the appellant receive the maximum sentence.

Jessica Richardson testified that she was one of the victim's best friends and that the appellant "took a great man's life." She said Braden had played baseball and football for the first time during the past year and that Braden had wished the victim could have been there to see him.

Ronald Dunn, Braden's grandfather, testified that the shooting was a tragedy that should not have happened. He stated that as a result of the victim's death, his wife woke up crying during the night. He said he had not seen the appellant express any remorse.

The State introduced the appellant's presentence report into evidence. According to the report, the then twenty-two-year-old appellant was not married but had a three-year-old son. The report shows that the appellant graduated from Apostolic Christian School in 2005 and received a certificate in Farrier Science from Mesalands Community College. In the report, the appellant stated that he began drinking alcohol when he was eighteen or nineteen years old and that he sometimes consumed small amounts of alcohol. However, the preparer of the report noted that the appellant had been charged with driving under the influence (DUI) in January 2008 and that the charge was still pending. In the report, the appellant described his physical and mental health as "good" but said he had been experiencing heart palpitations for the past four or five years. The report shows that at the time of the sentencing hearing, the appellant was working as a laborer for Johnson & Gaylon Construction and that he worked as a salesman for Ole Ben Franklin Motors from March 2006 to May 2007 and Johnson & Gaylon from December 2005 to February 2006.

The report shows that prior to this incident, the appellant pled guilty to misdemeanor vandalism, possession of burglary tools, and two counts of misdemeanor theft. The appellant received judicial diversion for the offenses with the convictions to be expunged from his record after he successfully completed eleven months, twenty-nine days on probation. However, his diversion was revoked after he was charged in this case. The report shows that in 2008, the appellant was charged with DUI, identity theft, misdemeanor theft, and felony theft. At the time of the sentencing hearing, the charges were still pending.

The trial court stated that "[t]his was a tragic case" in which the victim went to the appellant's house "itching for a fight" and the appellant "egged him on." The court noted that although the victim had instigated the confrontation, the appellant should have closed the door and called the police. The court noted that the range of punishment for a Range I, standard offender convicted of a Class C felony was three to six years. See Tenn. Code Ann. § 40-35-112(a)(3). The trial court applied enhancement factors (1), that the appellant "has

a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" and (8), that the appellant "failed to comply with the conditions of a sentence involving release into the community," but determined that the factors were not entitled to much weight. See Tenn. Code Ann. § 40-35-114(1), (8). The trial court also applied enhancement factor (9), that the appellant used a firearm during the commission of the offense, and stated, "that's an incredibly important factor." In mitigation, the trial court noted that the appellant was employed and took care of his family. See Tenn. Code Ann. § 40-35-113(13). The trial court sentenced the appellant to six years, the maximum punishment in the range.

Regarding probation, the trial court stated, "I think I've placed people on probation in voluntary manslaughter cases, but . . . I have a different attitude about cases in which people die, and I have a different attitude about this case." The trial court also stated that the appellant "made a very bad decision" and needed to be punished but that the appellant could be rehabilitated. The trial court ordered that the appellant serve one year in confinement with five years to be served on probation.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant contends that his sentence is excessive because the trial court placed too much emphasis on the use of a firearm and the fact that someone died. We disagree. The trial court found three enhancement factors applicable and placed a great deal of weight on one of them. As we have repeatedly stated, the weighing of mitigating and enhancing factors is left to the trial court's sound discretion. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). Therefore, the appellant's six-year sentence is not excessive.

Regarding the trial court's denial of full probation, an appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a) (2006). The appellant's sentence meets this criteria. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

In the instant case, the appellant is a Range I, standard offender convicted of a Class C, felony; therefore, he is considered to be a favorable candidate for alternative sentencing. However, the trial court's explanation for ordering the appellant to serve one year in confinement demonstrates that the court determined the appellant should not be granted full probation because to do so would depreciate the seriousness of the offense.

In denying full probation to avoid depreciating the seriousness of the offense, the criminal act should be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. Zeolia, 928 S.W.2d at 462. During sentencing, the trial court stated,

> Had this -- had this stayed as a fistfight, Mr. LaRue, we wouldn't be here today. If you'd -- if you decided to stay outside and curse each other for three hours or duke it out or do whatever and not decided to go back inside and get that shotgun, we wouldn't be here today. You wouldn't be a convicted felon.

Mr. Harrold wouldn't be dead.

In our view, the facts of this case are of an excessive or exaggerated degree. After the victim arrived at the condo and spoke with the appellant outside, the appellant was able to go back into his home without any interference from the victim. The appellant had the opportunity to stop the confrontation and telephone the police, but he chose to retrieve a shotgun and confront the unarmed victim. The trial court properly ordered the appellant to serve one year in confinement.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____

NORMA MCGEE OGLE